Counsel of Record:
Andrew M. Calamari
Amelia Cottrell
Lara Shalov Mehraban
David Stoelting
William T. Conway III
Tracy Sivitz
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0174 (Stoelting)
E-mail: stoeltingd@sec.gov



JUDGE FURMAN

**15 CV 1820**

RECEIVED
MAR 11 2015
U.S.D.C. S.D. N.Y.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

        v.

**DAVID CRAVEN and**
**ALEXANDER J. CRAVEN,**

                              **Defendants,**

        and

**ANNA CRAVEN,**

                              **Relief Defendant.**
-------------------------------------------------------------------x

15-CV-_____ (   )

**COMPLAINT**

        Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants David Craven ("D. Craven") and Alexander Craven ("A. Craven"; together, the

"Cravens" or "Defendants") and Anna Craven as relief defendant (the "Relief Defendant")

alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This is an emergency action against D. Craven and his son, A. Craven, both British citizens residing in Switzerland and England, respectively, to prevent the dissipation and expatriation of U.S. assets.  Since 2013, D. Craven has been liquidating U.S. assets, such as real estate and cash, and expatriating the proceeds to foreign accounts under his control in Switzerland and Guernsey.  The Commission seeks an emergency order freezing D. Craven's and his wife's, Anna Craven's, assets in the United States in order to prevent the expatriation of further U.S. assets, including the proceeds from the sale of their house in Kissimmee, Florida, which has been under contract for sale since March 3, 2015.

2.      This action arises out of a fraudulent "pump and dump" scheme by the father-son tandem of D. Craven and A. Craven to manipulate the public trading market for American Energy Development Corp. ("AEDC") stock in violation of the federal securities laws.

3.      From approximately March 2011 through at least May 2013, the Cravens gained control of approximately 87% of AEDC's unlegended stock (a term used herein to denote all shares issued without restrictive legends) through foreign entities under their control.  After amassing nearly all of AEDC's unlegended stock, the Cravens were able to inflate its trading price and volume through the following deceptive measures:

   a. Beginning in October 2011, at a time when there was no market for AEDC stock, the Cravens engaged in matched and wash trading of the stock to artificially increase its trading price to more attractive and respectable levels and to create the false impression of legitimate trading volume; and

    b.   Between March and May 2012, through multiple nominee companies, the Cravens secretly funded a $1.6 million promotional campaign involving the distribution of a 16-page "newsletter" to 1.2 million U.S. residents beginning in April and May 2012. The newsletter's rosy predictions succeeded in driving up the price for and daily trading volumes in AEDC stock.

4.    As the price and trading volumes of AEDC were being pumped by these deceptive measures, the Cravens, through overseas accounts under their control, sold over 4.8 million shares of AEDC stock for proceeds of over $4.9 million.

5.    By engaging in the conduct set forth in this Complaint, the Cravens, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws, as follows:

    a.   The Defendants violated Sections 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a)(1), (2) and (3), Sections 9(a)(1) and (2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78i(a)(1) and (2) and 78j(b), and Exchange Act Rules 10b-5(a) and (c), 17 C.F.R. §§ 240.10b-5(a) and (c).

6.    Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

8.    The Commission seeks an emergency order: (a) restraining and enjoining the Defendants from further violations; (b) freezing the D. Craven's and Anna Craven's assets in the United States; (c) prohibiting Defendants from destroying documents; (d) ordering Defendants and Relief Defendant to provide a verified accounting; (e) ordering Defendants to repatriate funds held overseas; (f) authorizing the Commission to conduct expedited discovery; and (g) authorizing alternative service of process.

9.    The Commission seeks a final judgment: (a) permanently enjoining Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering Defendants and Relief Defendant to disgorge all ill-gotten gains and to pay prejudgment interest thereon, jointly and severally; (c) prohibiting Defendants, pursuant to Section 20(g)(1) of the Securities Act, 15 U.S.C. § 77t(g)(1), and Section 21(d)(6)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(6)(A), from participating in any offering of a penny stock; and (d) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

10.    The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 77u(e).  The Defendants, either directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

11.    Venue lies in the Southern District of New York pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa,

because certain of the acts, practices, transactions and courses of business constituting violations

of the federal securities laws occurred within this district.  For example, between October 2011

and June 2013, D. Craven deposited shares of AEDC stock at, and executed trades through,

financial institutions located in the Southern District of New York.  In addition, during the

relevant period, AEDC maintained an office in the Southern District of New York and

individuals residing in the Southern District of New York purchased shares of AEDC stock

during the promotional campaign.

<u>**DEFENDANTS AND RELIEF DEFENDANT**</u>

12.    **D. Craven,** age 58, is a U.K. citizen residing in Gland, Switzerland.  D. Craven

owns with his wife, Anna Craven, a home in Kissimee, Florida that is currently for sale, as well

as undeveloped acreage in Warren County, Kentucky.  D. Craven also has a U.S. bank account at

Suntrust Bank.  D. Craven was affiliated with EuroHelvetia TrustCo SA ("EuroHelvetia"), a

purported wealth administration firm based in Geneva, Switzerland.  Until on or around March

2014, EuroHelvetia's website listed D. Craven as a managing director and noted that he had been

part of the firm for nearly 25 years.  D. Craven is also listed as the Secretary and Director for the

microcap company, Star Resorts Development, Inc. (ticker: SRDP).

13.    **A. Craven**, age 33, is a U.K. citizen residing in Gloucestershire, England.  During

the relevant period, A. Craven purportedly served as AEDC's outside consultant through his

U.K. based firm, City Capital (U.K.) Ltd., and acted as a *de facto* officer of AEDC.  A. Craven

previously served as Vice President and Director of the microcap company, Fox Petroleum, Inc.

(ticker: FXPE).  A. Craven is currently a professional racecar driver in Europe.

14.    **Anna Craven**, age 37, is a Russian citizen residing in Gland, Switzerland.  Anna

Craven is married to D. Craven.  She received approximately $300,000 in wires from an account that had been used by D. Craven to sell AEDC shares.

**RELATED ENTITIES**

15.     **AEDC** is a Nevada corporation with offices in Manhattan that purports to be an energy exploration company with minority ownership interests in oil and gas wells located in Michigan and the U.K.  The company was incorporated in Nevada in March 2010 under the name LJM Energy Corporation.  In July 2011, the company changed its name to AEDC.  AEDC stock was quoted on the OTC Bulletin Board under the ticker symbol "AEDC" from July 2011 to November 2012.  AEDC stock is currently quoted on the OTC Link under the same ticker symbol.

16.     **EuroHelvetia** is a Swiss Financial Market Supervisory Authority (FINMA) authorized wealth administration firm based in Geneva, Switzerland.  In or around December 2014, EuroHelvetia changed its name to EHT Corporate Services SA.

17.     **Langold Enterprises Ltd.** ("Langold") was formed in May 2010 in the Republic of Seychelles.  D. Craven is Langold's sole director and was its sole shareholder until June 2010, when he transferred his Langold shares to his six-year-old child.  Langold had a Guernsey-based bank and brokerage account over which D. Craven had sole signatory authority and control at all relevant times.  D. Craven used Langold's Guernsey account to sell AEDC shares and to indirectly fund AEDC as well as the AEDC promotional campaign.

18.     **Montafon Invest Ltd.** ("Montafon") was formed in March 2011 in the Republic of the Marshall Islands.  Montafon maintained a Swiss trading account beneficially owned by A.

Craven that was used to sell AEDC shares and to indirectly fund the AEDC promotional campaign.

19.     **Themis Partners Ltd.** ("Themis Partners") was formed in June 2010 in Belize. Themis Partners purported to be a venture capital firm but in reality served as the Cravens' nominee for purposes of funding the AEDC promotional campaign.

## FACTUAL ALLEGATIONS

I.     **D. Craven's Accumulation of AEDC Stock.**

20.     AEDC was incorporated on March 10, 2010 in the state of Nevada under the initial name of LJM Energy Corporation, a purported energy exploration company.

21.     On January 18, 2011, AEDC commenced an initial public offering ("IPO") to raise up to $1 million through the sale of 10 million shares of stock at the price of $0.10 per share. Through its IPO, AEDC ultimately raised $230,557 from 27 investors. The largest of AEDC's IPO investors was Langold, an entity that was controlled and effectively owned by D. Craven. Specifically, on or around March 29, 2011, Langold invested $200,000 through a wire to AEDC's U.S. bank account in return for two million shares of AEDC common stock, making it AEDC's largest shareholder. On July 7, 2011, D. Craven executed legal documentation that caused Langold's two million shares of AEDC to be transferred to a Manhattan-based financial institution for custody.

22.     AEDC's stock was cleared for public trading on June 7, 2011. On July 15, 2011, AEDC announced that it had implemented a 30-for-1 forward stock split. As a result of the forward stock split, Langold's two million shares became 60 million shares, amounting to roughly 87% of AEDC's unlegended shares.

II.   **The Cravens Conceal Their AEDC Stock Ownership Through
      A Vast Network of Nominee Companies Under Their Control.**

23.   Three days after AEDC's forward stock split, D. Craven began spreading Langold's 60 million shares among various nominee companies under his and A. Craven's control in order to obscure their ownership and control over the stock.

24.   As an initial step, on July 18, 2011, D. Craven emailed Langold's stock broker to advise of the forward stock split and that he "need[ed] to have th[e] certificate split into various names." In the same e-mail, D. Craven instructed Langold's stock broker to transfer 52 million of Langold's 60 million AEDC shares to the following foreign companies under his and A. Craven's control:

| Company | Location | Number of Shares |
|---|---|---|
| Asia-Pacific Capital Ltd. | Tortola, BVI | 7.5 million |
| BC Management S.A. | Nevis | 7.775 million |
| City Capital Equity Ltd. | Tortola, BVI | 7.25 million |
| Fenzo Finance S.A. | Nevis | 7.4 million |
| Figaro Invest & Finance Co. | Tortola, BVI | 7.9 million |
| Lenzer Invest & Finance Inc. | Tortola, BVI | 7.3 million |
| Plentum International SA | Panama City | 6.875 million |

25.   On October 14, 2011, Lenzer Invest & Finance Inc. ("Lenzer") transferred, at no cost, its 7.3 million AEDC shares to a Swiss account in the name of Montafon. D. Craven incorporated Lenzer and is its sole director, while Montafon's Swiss account is beneficially owned by A. Craven.

26.     Between February 22, 2012 and April 13, 2012, D. Craven directed Langold to transfer at no cost or sell at prices of up to $0.50 per share over 2.8 million of its remaining 8 million AEDC shares to nine foreign companies with Swiss trading accounts.  At least seven of these accounts were beneficially owned by clients of EuroHelvetia (referred to herein as "EuroHelvetia Clients A – G"), and controlled, through trading authorization, by D. Craven.

27.     Pursuant to an April 5, 2012 e-mail, A. Craven directed City Capital Equity Ltd.'s ("City Capital Equity") stock broker to transfer, at no cost, 3 million of its AEDC shares to ACR Holdings, Ltd. ("ACR Holdings").  D. Craven is the beneficial owner of City Capital Equity's Swiss trading account and A. Craven is the company's sole director.  D. Craven has trading authorization over ACR Holdings' Swiss trading account and A. Craven is its beneficial owner. Notably, this share transfer coincided with the start of the Cravens' AEDC promotional campaign and allowed for the Cravens to utilize ACR Holdings' account to engage in timely sales of AEDC stock.

### III.   The Cravens Pump AEDC Stock.

28.     With control of a large percentage of AEDC's unlegended shares, the Cravens undertook a number of measures to artificially increase – or "pump" – the trading price and volume for AEDC stock.

### A.   The Cravens Engage in Deceptive Trading.

29.     Beginning in October 2011, the Cravens traded AEDC stock between themselves through numerous accounts under their control at prearranged prices – a technique known as "matched trading" or "wash trading" – in order to artificially inflate AEDC's stock price to more attractive levels and to create the false impression of trading volume and, thus, liquidity in the stock, prior to their promotional campaign.  The Cravens' matched and wash trading gave

9

investors the false impression that independent, bona fide investors were interested in AEDC and valuing AEDC stock at the price that these trades reflected.

30.     Reported trading in AEDC shares began in October 2011.  From October 2011 through mid-February 2012, there had been only six days on which any trades of AEDC stock were reported.  Each of the reported trades during this time period were small in volume but suspiciously high in price (ranging from $0.85 to $1.57 per share).  The Cravens engaged in matched and wash trading on five of the first six days that AEDC stock traded.  A. Craven traded though an individual U.S. brokerage account in his name.  D. Craven traded through omnibus accounts belonging to overseas brokerage firms, ABN Amro (Guernsey) Ltd. ("ABN Amro"), Winterflood Securities Ltd. ("Winterflood Securities") and CBH Compagnie Bancaire Helvetique SA ("CBH Compagnie").  D. Craven utilized the Winterflood Securities and ABN Amro accounts to trade Langold's AEDC shares and the CBH Compagnie account to trade ACR Holdings' AEDC shares.  The Cravens' matched and wash trades utilized New York-based market makers in order to complete the transactions.

31.     Below is a summary of the Cravens' trading of AEDC stock during these initial days of trading of AEDC's stock:

| Date | Account | Buy/Sell | # of Shares Executed | Exec. Price | Execution Time | Total Daily Volume | % OF BUY VOLUME ATTRIBUTED TO THE CRAVENS | % OF SELL VOLUME ATTRIBUTED TO THE CRAVENS |
|---|---|---|---|---|---|---|---|---|
| 10/11/2011 | Alexander J. Craven | Buy | 2,500 | $0.85 | 12:57:01 PM | | | |
| 10/11/2011 | Langold Enterprises Ltd. | Sell | (2,500) | $0.85 | 12:57:01 PM | 2,500 | 100% | 100% |
| 10/13/2011 | Langold Enterprises Ltd. | Buy | 2,500 | $0.85 | 2:15:22 PM | | | |
| 10/13/2011 | Langold Enterprises Ltd. | Sell | (2,500) | $0.85 | 2:15:22 PM | 2,500 | 100% | 100% |
| 1/12/2012 | ACR Holdings Ltd. | Buy | 2,500 | $0.85 | 3:22:55 PM | | | |
| 1/12/2012 | Langold Enterprises Ltd. | Sell | (2,500) | $0.85 | 3:22:55 PM | | | |
| 1/12/2012 | ACR Holdings Ltd. | Buy | 500 | $1.01 | 3:24:07 PM | | | |
| 1/12/2012 | ACR Holdings Ltd. | Buy | 500 | $1.10 | 3:24:53 PM | | | |
| 1/12/2012 | Alexander J. Craven | Sell | (500) | $1.10 | 3:24:53 PM | 3,500 | 100% | 86% |
| 1/24/2012 | ACR Holdings Ltd. | Buy | 1,000 | $1.10 | 9:29:25 AM | | | |
| 1/24/2012 | Langold Enterprises Ltd. | Sell | (1,000) | $1.10 | 9:29:25 AM | | | |
| 1/24/2012 | ACR Holdings Ltd. | Buy | 1,000 | $1.10 | 9:29:42 AM | | | |
| 1/24/2012 | Langold Enterprises Ltd. | Sell | (1,000) | $1.10 | 9:29:42 AM | | | |
| 1/24/2012 | ACR Holdings Ltd. | Buy | 2,500 | $1.10 | 9:31:34 AM | | | |
| 1/24/2012 | Langold Enterprises Ltd. | Sell | (2,500) | $1.10 | 9:31:34 AM | | | |
| 1/24/2012 | ACR Holdings Ltd. | Buy | 2,500 | $1.10 | 9:32:45 AM | | | |
| 1/24/2012 | Langold Enterprises Ltd. | Sell | (2,500) | $1.10 | 9:32:45 AM | | | |
| 1/24/2012 | Langold Enterprises Ltd. | Sell | (3,000) | $1.10 | 9:32:55 AM | 12,000 | 58% | 83% |
| 1/25/2012 | Langold Enterprises Ltd. | Sell | (500) | $1.57 | 2:41:43 PM | 500 | 0% | 100% |
| 2/16/2012 | ACR Holdings Ltd. | Buy | 500 | $1.10 | 3:12:20 PM | | | |
| 2/16/2012 | Langold Enterprises Ltd. | Sell | (500) | $1.10 | 3:12:20 PM | | | |
| 2/16/2012 | ACR Holdings Ltd. | Buy | 2,500 | $1.10 | 3:12:54 PM | | | |
| 2/16/2012 | Langold Enterprises Ltd. | Sell | (2,500) | $1.10 | 3:12:54 PM | | | |
| 2/16/2012 | ACR Holdings Ltd. | Buy | 2,000 | $1.10 | 3:13:46 PM | | | |
| 2/16/2012 | Langold Enterprises Ltd. | Sell | (2,000) | $1.10 | 3:13:46 PM | 10,000 | 50% | 50% |

32.     As illustrated in the chart, the first trade of AEDC stock on October 11, 2011

involved both of the Cravens.  In that trade, A. Craven purchased 2,500 shares of AEDC stock

from D. Craven (through Langold) for the unsubstantiated price of $0.85 per share.  Two days

later, on October 13, 2011, D. Craven bought back the same quantity of shares (2,500) for the

exact same price ($0.85) from Langold through a different account, effectively trading with

himself.  The Cravens' trades on both of these dates made up 100% of the daily trading volume

for AEDC stock.

33.     On January 12, 2012, A. Craven engaged in another matched trade when he sold

500 shares of AEDC stock to the Cravens' ACR Holdings account for $1.10 per share, further

inflating the stock's perceived market price.  On the same date, D. Craven also had ACR

Holdings purchase 2,500 shares from Langold for $0.85 per share, once again trading with himself.

34.     On January 24 and February 16, 2012, D. Craven engaged in additional wash trades with himself at economically irrational prices. On those dates, through the Langold and ACR Holdings accounts under his control, D. Craven bought and sold AEDC shares at the price of $1.10 per share, which implied a market capitalization of over $96 million for AEDC's stock.

**B.      The Cravens Secretly Fund the AEDC Promotional Campaign.**

35.     In April 2012, AEDC became the subject of an aggressive promotional campaign that was secretly funded by foreign companies under the Cravens' control. Between April 3 and May 8, 2012, a number of microcap promoters began touting AEDC across multiple media outlets, including the mass-mailing of a 16-page newsletter to 1.2 million U.S. residents (the "AEDC Mailer"), along with e-mail blasts and internet website advertising. The AEDC Mailer made grossly exaggerated claims about the likely success of AEDC's oil exploration and the potential value of AEDC shares.

36.     For example, the AEDC Mailer contained unsupportable and false claims such as "Just $5,000 in AEDC [could] fetch a fast $110,550!," "AEDC could very well be a Billion dollar company by summer," "AEDC is already sitting on a massive play where just one of their wells is a proven $800 million gusher!" and "we could see shares hit $4.26 fast, and upwards of $27.63 when all is said and done." The AEDC Mailer also encouraged investors to purchase AEDC stock through statements such as "Take Action Now!" and recommended that they do so at a price of under $4 per share. In addition, the AEDC Mailer falsely claimed that the Michigan wells it invested in were in close proximity to other wells owned and operated by companies

including ExxonMobil when in reality, at the time, major oil and gas companies such as ExxonMobil were not the owners of any oil or gas wells anywhere near the wells that AEDC invested in.

37.     According to the AEDC Mailer, Themis Partners paid $1.6 million to a U.S. marketing company to conduct the promotional campaign and "approved for public dissemination" all statements within the document.  Unbeknownst to the recipients of the AEDC Mailer, however, was that the Cravens used Themis Partners as a conduit to disguise their funding of the AEDC Mailer:

   a.  On March 17, 2012, D. Craven instructed Langold's broker to wire $510,000 from Langold's account to Themis Partners, referring to it as a "payment concerning a market awareness program on [AEDC]."  On March 22, 2012, Themis Partners used this money to fund its $500,000 wire to the marketing company as down payment for the AEDC Mailer.

   b.  On March 17, 2012, Arliss International, Inc., the Swiss account for which A. Craven is listed as the "settlor" (*i.e.,* the person who creates the trust identified as the account's beneficial owner) and D. Craven had signatory authority and served as the sole director, wired $204,000 to Themis Partners.  On March 28, 2012, Themis Partners wired that $200,000 to the marketing company as the second payment for the AEDC promotional campaign.

   c.  On May 5, 2012, Montafon's Swiss account, which is beneficially owned by A. Craven, wired $922,500 to Themis Partners.  On May 8, 2012, Themis Partners

then wired $900,000 to the marketing company as final payment towards the AEDC promotional campaign.

38.     A. Craven also assisted the U.S. marketing company with the drafting and design of the AEDC Mailer and related online marketing materials.

39.     The AEDC Mailer was misleading in that it failed to disclose that AEDC's largest shareholders, the Cravens, were promoting the purchase of AEDC stock by funding the AEDC Mailer's production and distribution while intending to sell AEDC shares that they controlled into the market during its dissemination.  The Cravens knew, or were reckless in not knowing, that the AEDC Mailer did not accurately disclose that they controlled and funded Themis Partners and that they intended to sell their AEDC shares at the inflated prices they intended the promotion to produce.

40.     The Cravens' promotional campaign produced its intended effect – to inflate the trading volume for AEDC stock and maintain an inflated trading price.  Before AEDC's promotional campaign, the average daily trading volume of AEDC stock was approximately 32,831 shares; during the promotional campaign (April 3 through May 8, 2012) AEDC's average daily trading volume increased to 542,412 shares while maintaining a closing price of $0.85 to $1.20 per share.

**IV.   The Cravens Dump Their AEDC Shares and the Aftermath of Their Manipulation.**

41.     The Cravens took advantage of the fraudulently inflated market that they had created for AEDC stock by "dumping" shares they controlled on investors that they were deceiving.  As detailed below, between February 21, 2012 and May 7, 2012, numerous accounts controlled by the Cravens sold over 4.5 million shares of AEDC stock to the public on the OTC

Bulletin Board ("OTCBB") at prices ranging from $0.85 to $1.20 per share, for proceeds of nearly $4.9 million, most of which occurred during the promotional campaign (April 3 to May 8, 2012) and all of which utilized U.S.-based market makers.  The Cravens executed these public sales through the following trading accounts under their control:

| Account Name | Financial Institution | Total Sale Quantity | Gross Sale Proceeds | Min Share Price | Max Share Price |
|---|---|---|---|---|---|
| Montafon | VP Bank | (1,468,800) | $1,551,433.40 | 0.915 | 1.189 |
| ACR Holdings | CBH | (1,239,176) | $1,428,456.68 | 1.033 | 1.23 |
| Langold | ABN AMRO | (1,131,265) | $1,132,840.70 | 0.91 | 1.219 |
| Kudos Indus. Inc | CBH | (210,000) | $232,276.50 | 0.95 | 1.1982 |
| Korrigan AG | CBH | (170,900) | $193,562.70 | 0.95 | 1.1982 |
| Malom (1982) Ltd. | CBH | (67,500) | $74,900.10 | 0.95 | 1.1982 |
| Crimson Ridge Invests. Inc | CBH | (67,500) | $74,755.10 | 0.95 | 1.1982 |
| Quovis Investments SA | CBH | (67,500) | $74,750.60 | 0.95 | 1.1982 |
| Concerto Ltd. | CBH | (47,500) | $51,471.80 | 0.95 | 1.1982 |
| Lock Partners Inc. | CBH | (45,000) | $50,863.10 | 0.9804 | 1.19563 |
| City Capital Equity | ABN AMRO | (2,500) | $2,825.00 | 1.13 | 1.13 |
| **Grand Total** | | **(4,517,641)** | **$4,868,135.68** | **0.91** | **1.23** |

42.   In addition to the public sales on the OTCBB, D. Craven made over $1 million from Langold's private sales to foreign accounts belonging to individuals including EuroHelvetia Clients A – G.

43.   Following these trades, by early 2013, AEDC's share price was trading for less than 10 cents a share, the company still had minimal assets, and disclosed that it had "limited revenue and a net loss" in excess of $15 million. In December 2013, AEDC suspended its public reporting requirements.

44.     Following the Cravens' dumping of AEDC shares, in May 2013, D. Craven wired

$299,922 of Langold's sale proceeds to another offshore account in the name of his wife, Anna

Craven.  In addition, between June 2012 and May 2013, D. Craven had Langold send a series of

wires totaling $49,922 to a MasterCard account in Anna Craven's name.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17 of the Securities Act
### (Both Defendants)

45.     The Commission repeats and realleges paragraphs 1 through 44 of its Complaint.

46.     The Defendants, directly or indirectly, singly or in concert, by use of the means or

instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities

exchange, in the offer or sale of securities, knowingly or recklessly, have: (a) employed devices,

schemes or artifices to defraud; (b) obtained money or property by means of any untrue

statement of material fact or omissions to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices or courses of business which operated or would have operated as a

fraud or deceit upon purchasers of securities and upon other persons.

47.     By reason of the foregoing, the Defendants, directly or indirectly, singly or in

concert, violated, is violating, and unless enjoined will again violate, Sections 17(a)(l) and (3) of

the Securities Act, 15 U.S.C. § 77q(a)(1), (2) and (3).

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Both Defendants)

48.     The Commission repeats and realleges paragraphs 1 through 47 of its Complaint.

49.     The Defendants, directly or indirectly, singly or in concert, by use of the means or

instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities

exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes or artifices to defraud; (b) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

50.     By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, are violating, and unless enjoined will again violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c), 17 C.F.R. §§ 240.10b-5(a) and (c), promulgated thereunder.

## THIRD CLAIM FOR RELIEF
### Violations of Section 9 of the Exchange Act
### (Both Defendants)

51.     The Commission repeats and realleges paragraphs 1 through 50 of its Complaint.

52.     The Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, knowingly or recklessly, and for the purpose of creating a false or misleading appearance of active trading in AEDC securities, or a false or misleading appearance with respect to the market for AEDC securities, engaged in the following unlawful activity:

   a.     Effected any transaction in such security which involves no change in the beneficial ownership thereof,

   b.     Entered an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or

c.    Entered any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

53.    The Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, knowingly or recklessly, effected, alone or with one or more other persons, a series of transactions in AEDC stock creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

54.    By reason of the foregoing, Defendants have violated, are violating, and unless restrained and enjoined, will again violate Section 9(a)(1) and (2) of the Exchange Act, 15 U.S.C. § 78i(a)(1) and (2).

### FOURTH CLAIM FOR RELIEF
**(Relief Defendant)**

55.    The Commission repeats and realleges paragraphs 1 through 54 of its Complaint.

56.    Relief Defendant Anna Craven received, directly or indirectly, without consideration, funds which are the proceeds of the unlawful activities alleged herein and to which she has no legitimate claim.

57.    Relief Defendant Anna Craven obtained the funds as part of and in furtherance of the securities violations alleged herein and under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and accordingly, Relief Defendant Anna Craven has been unjustly enriched by ill-gotten gains.

58.    By reason of the foregoing, Relief Defendant Anna Craven should disgorge her

ill-gotten gains, plus pre-judgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

An Order temporarily restraining and preliminarily enjoining Defendants from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 9(a) and 10(b) of the Exchange Act, 15 U.S.C. §§ 78i(a) and 78j(b), 15 U.S.C. and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

### II.

An Order freezing D. Craven's and Anna Craven's assets in the United States;

### III.

An Order permanently restraining and enjoining Defendants and any person or entity acting at their discretion or on their behalf, form destroying, altering, concealing, or otherwise interfering with the access of the Commission to, relevant documents, books and records;

### IV.

An Order requiring Defendants and Relief Defendant each to provide a verified accounting;

### V.

An Order requiring Defendants to repatriate funds held overseas;

### VI.

An Order authorizing the Commission to conduct expedited discovery;

**VII.**

A Final Judgment finding that Defendants each violated the securities laws and rules promulgated thereunder as alleged against them herein;

**VIII.**

A Final Judgment permanently enjoining and restraining Defendants from violating, directly or indirectly, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 9(a) and 10(b) of the Exchange Act, 15 U.S.C. §§ 78i(a) and 78j(b), 15 U.S.C. and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

**IX.**

A Final Judgment ordering Defendants jointly and severally to disgorge their ill-gotten gains, if any, plus prejudgment interest;

**X.**

A Final Judgment ordering Relief Defendant Anna Craven to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint;

**XI.**

A Final Judgment prohibiting Defendants, pursuant to Section 20(g)(1) of the Securities Act, 15 U.S.C. § 77t(g)(1), and Section 21(d)(6)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(6)(A), from participating in an offering of penny stock;

**XII.**

A Final Judgment ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 17 U.S.C. § 78u(d)(3); and

## XIII.

Granting such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: March 11, 2015
      New York, New York

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By: _____
    Andrew M. Calamari
    Regional Director
    New York Regional Office
    200 Vesey Street, Suite 400
    New York, New York 10281
    (212) 336-0174 (Stoelting)
    E-mail: stoeltingd@sec.gov

*Of Counsel:*

Amelia A. Cottrell
Lara Shalov Mehraban
David Stoelting
William T. Conway III
Tracy Sivitz